UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

WILLIAM BRIAN CLEMMONS

                        CIVIL ACTION

            Plaintiff,

                        No. 3:14-00432-JWD-RLB

VERSUS


GEORGIA-PACIFIC CORPORATION,
and
THE UNITED STEEL, PAPER, AND
FORESTRY, RUBBER,
MANUFACTURING, ENERGY,
ALLIED INDUSTRIAL AND SERVICE
WORKERS INTERNATIONAL UNION
(USW), LOCAL 1334

                  Defendants.

**RULING ON MOTIONS TO DISMISS**

## I.    INTRODUCTION

Before the Court are the first Motion to Dismiss Amended Complaint, (Doc. 40), and Second Motion to Dismiss for Failure to State a Claim (collectively, "Motions to Dismiss"), (Doc. 41), filed by the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union (USW), Local 1334 ("Union"), and Georgia-Pacific Corporation ("GP" or "Georgia Pacific") (collectively, "Defendants"), respectively. Plaintiff, Mr. William Brian Clemmons ("Clemmons" or "Plaintiff"), opposes both motions. (Docs. 43, 44.) Oral argument is not necessary.

Case law and fact compel three conclusions. First, Plaintiff's harassment claims must be dismissed for one simple reason: this Court lacks subject matter jurisdiction over Plaintiff's harassment claims because they are arguably subject to Section 7 or 8 of the National Labor

Relations Act ("NLRA"),[1] a federal labor law implemented and administered by the National Labor Relations Board ("NLRB") since July 5, 1935. Second, Plaintiff's claim with respect to the overtime board averaging must be dismissed with prejudice, as Plaintiff has failed to amend his complaint to allege that he at least attempted to exhaust the grievance procedure in the collective bargaining agreement, the minimum legal requirement. Finally, Plaintiff's claim under Louisiana's Right-to-Work Law ("LRWL") must too be dismissed. Here, the LRWL is preempted by the NLRA because, with Plaintiff having been able to work after leaving the Union, no "de facto" union security agreement[2] existed, the only relevant (and pleaded) exception to the NLRA's otherwise broad preemptive ambit.

For these reasons, as more fully explained below, this Court **GRANTS** the Motions to Dismiss. (Doc. 43; Doc. 44.)

## II.   FACTUAL AND PROCEDURAL BACKGROUND

The relevant background has already been summarized in numerous prior orders; accordingly, this Court now recaps only the most recent salient facts and allegations. (*See* Doc. 32 at 1-4; Doc. 34 at 1-4.)  In two separate orders, addressing two different dispositive motions, (Docs. 4, 12), the Court dismissed all of Plaintiff's claims against Defendants.[3] (Docs. 32, 34.)

---

[1] In this opinion, any reference to "Section []" or "§ []" is to a section of the NLRA.

[2] Broadly defined, a de facto union security agreement, also called a de facto closed shop in literature and case law, is an accord between a union and an employer that essentially bars the latter from hiring non-union members. *See, e.g.*, *Baker v. Int'l Alliance of Theatrical Stage Emps. & Moving Picture Operators of U.S. and Can.*, 691 F.2d 1291, 1293 (9th Cir. 1982) (noting that a regional director had found "found insufficient evidence of a de facto closed shop"); Richard W. Latham, *What is the Significance of 14(b) and Related "Right-to-Work" Legislation*, 4 INDUS. & LAB. REL. F. 357, 361–62 (1967–68) (discussing the rise of the de facto union shop in Texas after its adoption of a right to work law). For more on this issue, see *infra* Part IV.c.

[3] Plaintiff's claims against the Union were dismissed with prejudice, while those against GP were dismissed without prejudice.

Nonetheless, pursuant to Federal Rule of Civil Procedure 15(a),[4] the Court granted Plaintiff leave to amend his original complaint, (Doc. 2), both to allege that "he at least attempted to exhaust the grievance procedure in the collective bargaining agreement," (Doc. 32 at 14; Doc. 34 at 12), and to more "sufficiently allege a claim for harassment under federal or state law that is unrelated to Plaintiff's filing charges with the NLRB," (Doc. 32 at 14).[5] Subsequently, on April 28, 2015, Plaintiff filed the Amended Complaint ("Complaint"). (Doc. 35.)

### a. Plaintiff's Amended Complaint

In spite of its adjudicated defects, the Complaint began by incorporating Plaintiff's original pleading.[6] (*Id.* ¶ 28 at 1.) Thereafter, Plaintiff attempts to tailor his allegations so as to address the Court's prior ruling. (*Id.* ¶¶ 28 at 1, 30 at 2–3.)

He begins with an attempt to buttress his original allegation that his vacation time was "improperly averaged into an overtime board." (*Id.* ¶ 29 at 1.) Plaintiff states that he "amend[s] his Complaint to cure [the] defect . . . that [he] has failed to allege that he at least attempted to exhaust the grievance procedure in the collective bargaining agreement[.]" (*Id.*) He does this in the following manner: while "the past practice was that, after returning from special details, an employee averaged into the board," "the [U]nion vice president directed otherwise in [his] case." (*Id.*) Plaintiff alleges that he "used the fact that he had recently taken vacation and averaged in

---

[4] In this opinion, any and all references to "Rule" or "Rules" are to the Federal Rules of Civil Procedure unless otherwise noted.

[5] The Court notes that in dismissing Plaintiff's claims against the Union, the Court did not specify that Plaintiff's harassment claims be unrelated to Plaintiff's filing charges with the NLRB. (Doc. 34 at 14.) However, Plaintiff's Amended Complaint, as it relates to his harassment claims, solely relies on the Court's Ruling with respect to GP. (Doc. 30 ¶ 30 at 2 (citing Doc. 34 at 14).) Accordingly, the Court need not address any discrepancy between GP and the Union's Motions to Dismiss related to Plaintiff's NRLB charges.

[6] By Plaintiff's choice, therefore, the Complaint does not supersede Plaintiff's original complaint. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (holding that an amended complaint supersedes an original complaint "unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading").

under a different procedure, which the maintenance secretary effected for [him]." (*Id.* ¶ 29 at 1-2.) To Plaintiff, "this event is evidence of union involvement in the harassment." (*Id.* ¶ 29 at 2.)

Next, with respect to harassment claims that are unrelated to Plaintiff's filing charges with the NLRB, Plaintiff alleges that "[e]very time a contract violation occurred, an explanation was offered to [P]laintiff by either the Company or the Union, or both." (*Id.* ¶ 30 at 2.) Plaintiff asserts that "when the letter outlining the 'Special Diamond Agreement' surfaced, at the end of February 2014, it became apparent that all of the previous explanations were untrue, which makes the emergence of this February 2014 letter the triggering event for the litigation." (*Id.*)

Plaintiff claims that "[t]he harassment was not in response to the NLRB charges, as the NLRB charges at most exacerbated the situation." (*Id.* (emphasis omitted)) According to Plaintiff:

> The harassment was based upon [his] refusal to allow the [U]nion and the company to sweep aside a ratified agreement that he was working under, punctuated by his withdrawing from the Union due to his perception of inadequate representation, and asking the NLRB to look into the fact that he had never actually joined the Union (whereas defendants had always taken dues out of his paycheck, in addition to continuing to withdraw Union Dues from his paycheck for another six months).

(*Id.*) Plaintiff alleges that "the NLRB . . . conclude[d] that [he] had never asked to join the Union and directed return of the previous six months dues paid" and thereafter "directed that a notice to all employees be placed at the facility entrance, outlining that defendants could not, and would not require Union membership in the future, for any employee." (*Id.* ¶ 30 at 2–3.) Plaintiff asserts that "when [he] did return to the . . . [collective bargaining agreement ("CBA")] contract and the day crew, after the . . . [memorandum of agreement ("MOA")] contract was fulfilled, the physical violence began and [he] filed formal charges with the company for workplace violence, fearing for his safety in a hostile Union environment. (*Id.* (emphasis omitted)) In his telling, "[t]his hostile environment led [P]laintiff to terminate his employment with Georgia Pacific in September 2014." (*Id.*)

For further support, Plaintiff directs this Court to an email. Dated September 8, 2014, [7] this missive, which was sent "[m]illwide," declared that when Plaintiff first was interviewed for his job at Georgia Pacific "almost thirty years ago," his long term goal was "[r]etirement." (Doc. 41-3 at 1.) Plaintiff acknowledged that ". . . it looks like that day has come, having been with GP half of my life." (*Id.*) He continued: "It has been [his] honor to work with some of the finest maintenance personnel in the world, there in Port Hudson, and you will be missed." (*Id.* at 2.) Plaintiff "couldn't begin to thank every one [sic] for the time [they] spent together[.]" (*Id.*) In closing out his email, Plaintiff told everyone to work safely, and that his "hope for all of [them] is that [they] reach this day, in [their] life, too." (*Id.*) Per this email, "the effective date [of his retirement would] be September 15[,] [2014]." (*Id.*)

In response, Mr. Tim Ellsworth ("Ellsworth"), the alleged project superintendent, wrote on September 9, 2014:

> Brian, congratulations with your retirement, I too look forward to that goal in 5 years. It has been a pleasure working with you - I truly respect what you and [T]erry did for us and am understanding of the bullets you guys took to move our product system towards a vision that quite frankly the mill was not ready for. It was an honor working with you.

(Doc. 41-3 at 1.) Plaintiff claims that this email from Ellsworth, "the project superintendent, written when [P]laintiff left GP . . . admits that he was aware that [P]laintiff was being harassed." (Doc. 35 ¶ 31 at 3.) Plaintiff further alleges that Ellsworth "did not take steps to ensure harassment

---

[7] The Court notes that Plaintiff claimed to have attached the emails and "made [them] a part" of his Amended Complaint (Doc 35 ¶ 31 at 3) but failed to do so. Nevertheless, GP admits to receiving a copy of the email and attached it to their Motion to Dismiss. (Doc. 41-3.) On a motion to dismiss, the court may consider "the complaint, its proper attachments, 'documents incorporated into the complaint by reference, and matters of which a court may take judicial notice.' " *Randall D. Wolcott, M.D., P.A. v. Sebelius*, 635 F.3d 757, 763 (5th Cir. 2011) (quoting *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 338 (5th Cir. 2008) (citations and internal quotation marks omitted). Thus, it is appropriate for the Court to consider the e-mails Plaintiff referenced in his Amended Complaint.

against [P]laintiff ceased." (*Id.*) Seemingly, Ellsworth "did speak to the crew on one occasion, but failed to provide follow-up supervision, allowing harassment to actually increase as a result." (*Id.*)

## III.    PROCEDURAL ISSUES

Before discussing the Parties' arguments concerning the Motions to Dismiss, there is an overriding procedural issue concerning Plaintiff's briefing and attachments to his Opposition that GP raises in its Motion to Dismiss.[8] In his Opposition to both motions, Plaintiff attaches a letter from GP's counsel, (Doc. 43-1; Doc. 44-1), an email from Plaintiff's counsel, (Doc. 43-2; Doc. 44-2), and his own affidavit. (Doc. 43-3; Doc. 44-3.) GP argues that "[t]hese exhibits are neither referenced nor otherwise central to the allegations in [Plaintiff's] Amended Complaint[,]" and, as such, "this Court should disregard such exhibits[.]" (Doc. 45 at 1 (citing *Xavier v. Belfor USA Grp., Inc.*, Nos. 06-491, 06-7084, 2007 WL 4224320, *2, 2007 U.S. Dist. LEXIS 87028, at *7 (E.D. La. Nov. 26, 2007)). Because Plaintiff relies upon these documents in varying degrees,[9] this Court must first address this procedural issue.

The governing standard appears in Rule 12, its many exceptions mined in case law. In general, pursuant to Rule 12(d), "[i]f, on a motion under Rule 12(b)(6)[,] . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." FED. R. CIV. P. 12(d); *United States v. Rogers Cartage Co.*, 794 F.3d 854, 861 (7th Cir. 2015). Naturally, there are some exceptions to this ostensibly ironclad standard, such as when documents are referenced or incorporated into a complaint. *See supra* note

---

[8] The Court notes that the Union does not raise this issue. Nonetheless, the Court must address this issue with respect to both motions.

[9] For example, in Plaintiff's Opposition to the Union's Motion to Dismiss, a large portion of his brief contains numerous block quotes from his affidavit. (*See* Doc. 44 at 1-7.)

7. As the Fifth Circuit has recently explained in this regard, "[i]f the district court does not rely on materials in the record, such as affidavits, it need not convert a motion to dismiss into one for summary judgment." *U.S. ex rel. Long v. GSDMIdea City, L.L.C.*, 798 F.3d 265, 275 (5th Cir. 2015) (citing *Davis v. Bayless*, 70 F.3d 367, 372 n. 3 (5th Cir. 1995). "[T]he mere submission [or service] of extraneous materials does not by itself convert a Rule 12(b)(6) [or 12(c)] motion into a motion for summary judgment." *Id.* (quoting *Finley Lines Joint Protective Bd. v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997)) (internal quotation marks omitted) (second alteration in original). A district court, moreover, enjoys broad discretion in deciding whether to treat a motion to dismiss as a motion for summary judgment. *See St. Paul Ins. Co. v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 280 n.6 (5th Cir. 1991). In light of this case law, the Court must determine whether Plaintiff's attached documents and affidavit should be considered, thus converting the motions to summary judgment, or excluded, rendering any such conversion unnecessary.[10] As Plaintiff has tendered multiple documents, each category must be analyzed separately.

First, with respect to the communications between Plaintiff's counsel and GP's counsel, these communications concerned a potential extension of time for Plaintiff to respond to the Motions to Dismiss as well as the discovery cut-off date in this Court's scheduling order. These communications bear no relevance to the Motions to Dismiss before the Court. Additionally, they were neither referenced nor incorporated in Plaintiff's Amended Complaint, a well-recognized exception, *see, e.g.*, *Tierney v. Vahle*, 304 F.3d 734, 738-39 (7th Cir. 2002); *Wright v. Assocs. Ins. Cos., Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). So convinced, the Court excludes these documents (Docs. 43-1, 43-2, 44-1 and 44-2), from its consideration pursuant to Rule 12(d).

---

[10] The Court notes that it looks at the documents and affidavit Plaintiff attached to his Oppositions for the sole purpose of determining if they merit consideration.

Second, with respect to Plaintiff's Affidavit, the affidavit appears to be a first person narrative of Plaintiff's original and Amended Complaint. Additionally, Plaintiff cites no authority for the proposition that such an affidavit may be considered on a motion to dismiss under Rule 12(b)(6). Indeed, case law suggests the opposite. As the Eastern District of Texas has noted, "[a]ffidavits typically are not considered in deciding a motion to dismiss[.]" *U.S. v. Williams*, No. 6:06-CV-524, 2008 WL 783555, at *4 n. 2, 2008 U.S. Dist. LEXIS 22460 (E.D. Tex. Mar. 20, 2008); *see also, e.g.*, *Newman v. Gagan LLC*, 939 F. Supp. 2d 883, 892 (N.D. Ind. 2013) ("If the court considers granting an ostensible motion to dismiss for failure to state a claim under Rule 12(b)(6) in reliance on anything . . . [beside a complaint and referenced matters], then additional procedures are required."); *Hill v. Trs. of Ind. Univ.*, 537 F.2d 248, 251 (7th Cir. 1976) ("Courts are restricted to an analysis of the complaint when evaluating a motion to dismiss" and may therefore not consider affidavits). Yet, another reason justifies setting aside Plaintiff's affidavit: rather than providing new evidence or illuminating context, this document offers little more than a narrative of much already recapped in his other briefing. With these essentially redundant materials providing no more meaningful evidence, the Court too excludes Plaintiff's affidavit, (Doc. 43-3; Doc. 44-3), from consideration.

Accordingly, the Court has excluded the documents and affidavit Plaintiff attached to his Oppositions; as a result, the Motions to Dismiss need not be converted to motions for summary judgment under the Rules.

## IV.    PARTIES' ARGUMENTS

Defendants have filed separate Motions to Dismiss, (Docs. 40, 41), seeking to dismiss

Plaintiff's claims pursuant to Rule 12(b)(6).[11]

### a.   The Union's Arguments

The Union argues that "Paragraph 29 of . . . [the] Complaint addresses the overtime averaging claim, but nowhere in that paragraph does Plaintiff allege that he attempted or requested to file a grievance challenging the improper averaging of his overtime." (Doc. 40-1 at 3.) As such, the Union asserts that this allegation in the Complaint should be dismissed. (*Id.*) Next, the Union contends that Plaintiff's allegations that he was "harassed based on his protected activity and that the totality of the circumstances constituted a violation of Louisiana's Right to Work law[,]" are preempted pursuant to so-called "*Garmon* Preemption," a doctrine pioneered in *San Diego Bldg. Trades Council, Millmen's Union, Loc. 2020 v. Garmon*, 359 U.S. 236, 79 S. Ct. 773, 3 L. Ed. 2d 775 (1959), *see, e.g.*, *Kaufman v. Allied Pilots Ass'n*, 274 F.3d 197, 200–01 (5th Cir. 2001). (Doc. 40-1 at 3.) The Union maintains that "[u]nder *Garmon*, claims based on activity arguably protected or prohibited by the National Labor Relations Act are subject to the primary jurisdiction of the National Labor Relations Board, and lawsuits in state or federal court are preempted." (*Id.*)

First, the Union argues that Plaintiff's claim that he was harassed based on his "refusal to allow the [U]nion and the company to sweep aside a ratified agreement that he was working under[,]" is an invocation of a collectively bargained right that constitutes "concerted activity" under § 7 of the NLRA. (Doc. 40-1 at 4). The Union contends that "a claim based on such a right is . . .  preempted under *Garmon*." (*Id.* (citing *Smith v. Hous. Oilers, Inc.*, 87 F.3d 717, 722 (5th Cir. 1996) (citing *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 840–41, 104 S. Ct. 1505, 1516,

---

[11] The Union moved for dismissal pursuant to Rules 12(b)(2), 12(b)(4), and 12(b)(6). (Doc. 40 at 1.) However, the Union only briefed dismissal pursuant to Rule 12(b)(6). As such, the Court need not address Rules 12(b)(2) and 12(b)(4).

79 L. Ed. 2d 839 (1984))).) In particular, the NLRB "has reasoned that a single employee's invocation of a right grounded in a collective bargaining agreement affects all employees covered by the agreement and thus constitutes concerted activity." (Doc. 40-1 at 4 (citing *City Disposal*, 465 U.S. at 829-30 (citing *Interboro Contractors, Inc.*, 157 NLRB 1295, 1298 (1966), *enf'd*, 388 F.2d 495 (2nd Cir. 1967))).) Consequently, "Plaintiff's protest against the abandonment of the MOA and return to the CBA is therefore protected under § 7 of the NLRA, and his claim of harassment based on that protect is preempted." (*Id.*)

Next, the Union argues that "Plaintiff's claim that the Union harassed him because of his withdrawal from the Union is . . . based on conduct arguably protected by § 7 or prohibited by § 8 of the NLRA, and this claim is [too] preempted under *Garmon*." (*Id.* at 5 (citing *Local 926, Int'l Union of Operating Eng'rs v. Jones*, 460 U.S. 669, 103 S. Ct. 1453, 75 L. Ed. 2d 368 (1983)).)

Finally, the Union asserts that Plaintiff's claim that "[t]he totality of the facts and circumstances in this case" constitutes a violation of LRWL, as encoded in Lᴀ. R.S. § 23:981 et seq., is "preempted because it does not involve a union security clause." (Doc. 40-1 at 5). The Union argues that while "Section 14(b) of the Taft-Hartley Act, 29 U.S.C. § 164(b) . . . allows states to prohibit union security clauses (provisions requiring union membership as a condition of employment), it is a narrow exception to federal preemption of state regulation in the labor arena." (*Id.* at 5–6.) As no security clause is involved, the Union insists, the Plaintiff's claims are preempted. (*Id.* at 6.)

### b.  Georgia Pacific's Arguments

Some of GP's arguments are similar to the Union's motion to dismiss. For example, with respect to Plaintiff's failure to allege that he at least attempted to exhaust the grievance procedure

in the CBA, GP argues that "Paragraph 29 of the Amended Complaint is the [P]laintiff's attempt to cure the defect, but nowhere in this paragraph or anywhere else in the Amended Complaint does [P]laintiff allege that he attempted to pursue the grievance and arbitration procedures under the CBA." (Doc. 41-1 at 4.) While GP goes into more detail, such as arguing that Plaintiff "simply reiterates the same substantive allegations contained in paragraph 12 of his original Petition[,]" (*Id.*), GP's essential argument is substantively identical – that Plaintiff has not alleged in his Amended Complaint that he attempted to pursue the grievance procedures. Beyond these similarities, however, GP's motion substantially differs from its codefendant's papers as to Plaintiff's harassment claims and the effect of preemption.

In regards to Plaintiff's harassment claims, GP argues that Plaintiff has "fail[ed] to allege that he was subjected to harassment based on a characteristic protected by any state or federal law outside one which falls within the exclusive jurisdiction of the NLRB." (*Id.* at 7.) GP asserts that "all of [P]laintiff's new allegations of harassment also concern rights protected by Sections 7 and 8 of the NLRA, 29 U.S.C. §§ 157 and 168." (*Id.* at 8.) Relatedly, GP argues that the LRWL is preempted because, similar to the Union, there is no union security agreement in the CBA. (*Id.* at 12.) GP also argues that Plaintiff was able to work after leaving the Union, and asserts that this very fact fatally contradicts Plaintiff's present claims. (*Id.*)

As to the Defendants' shared preemption argument, while the Union reasons that because Plaintiff's claims are preempted they should be dismissed on the merits, GP contends that Plaintiff's "claim of harassment remains subject to *Garmon* preemption and falls within the exclusive jurisdiction of the NLRB." (Doc. 41-1 at 9.) With the NLRB thusly uniquely empowered, this Court presently "lacks jurisdiction over [Plaintiff's harassment] claim." (*Id.* at 13.) Rather than raising preemption as a defense, then, GP pleads a jurisdictional bar, the

substantive argument otherwise identical. This difference will be discussed below.

### c.  Plaintiff's Arguments

Plaintiff opposes the Motions to Dismiss separately.[12]

### i.  Plaintiff's Opposition to the Union's Motion to Dismiss

In this first attack, Plaintiff relies on numerous excerpts from his Affidavit in opposing the Union's Motion to Dismiss, (Doc. 40). (*See* Doc. 44 at 1-7.) As explained above, Plaintiff's Affidavit must be excluded. *See* supra Part III. As Plaintiff has chosen to pepper his Opposition with extensive quotes from an affidavit, those portions of his opposition are not properly before the Court for purposes of Rule 12. Bound by these constraints, this Court therefore only considers those portions of Plaintiff's Opposition that have been properly presented.

Plaintiff argues that the Union is "re-hash[ing]" its previous argument to dismiss his claim. (Doc. 44 at 1.) Whatever his first try's defects, the newest Complaint "plausibl[y] suggest[s] . . . illegal discrimination, harassment, and retaliation by both [Defendants][.]" (*Id.*) In his reading, by "[d]raw[ing] on its juridical experience and common sense," this Court cannot but recognize that a labor union will be none too happy to have a 27-year employee decide to spend his union dues elsewhere[.]" (*Id.* at 3 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009)).)

Plaintiff quotes from the original complaint, presumably to support this statement, asserting that he resigned from the Union on January 4, 2013, and gave instructions to stop

---

[12] As noted by GP, Plaintiff incorporates in his Oppositions his prior arguments made in response to the first two motions to dismiss. (Doc. 43 at 1 n. 1; Doc. 44 at 1 n. 1.) As the Court has already ruled on these prior arguments, *see* supra Part II, the Court declines to re-hash those issues.

collecting dues from his wages. (*Id.* (quoting Doc. 2 ¶ 9 at 5).) Plaintiff alleges that the Union refused because of language in their contract and collected dues from him through the middle of June 2013. (*Id.* (quoting same).) Moving onto more doctrinal terrain, Plaintiff dismisses *Garman* as "distinguishable on its facts[.]" (*Id.* at 3.) Additionally, Plaintiff appears to argue that similar to *Smith v. Houston Oilers*, 87 F.3d 717 (5th Cir. 1996), where the Fifth Circuit endorsed an exception to federal preemption where "the defendants' 'outrageous conduct' is merely a peripheral concern of federal law," there was no quick response to his claim. (Doc. 44 at 4.) Further, Plaintiff claims that *Hobbs v. Hawkins*, 968 F.2d 471 (5th Cir. 1992), "is inapposite" because it was a dispute about a union certification election campaign. (*Id.*)

Next, with respect to the preemption argument, Plaintiff argues that the Supreme Court in *City Disposal Sys., Inc.*, 465 U.S. at 840–41, "recognized the type of [Defendants'] ploy that '. . . a requirement that the employee explicitly refer to the collective-bargaining agreement is likely to serve as nothing more than a trap for the unwary.'" (Doc. 44 at 4.) Plaintiff also appears to claim that *City Disposal*, 465 U.S. at 829–30, is contrary to Defendant's assertions. (*Id.* at 5.)

Additionally, Plaintiff claims that "[g]iven the totality of facts and circumstances, de facto there is a union security agreement involved[.] " (*Id.* at 6.) Plaintiff asserts that this "totality constitutes '. . . the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.'" (Doc. 44 at 6 (quoting *Retail Clerks Intern. Ass'n, Loc. 1625, AFL-CIO v. Schermerhorn*, 375 U.S. 96, 99, 84 S. Ct. 219, 220, 11 L. Ed. 2d 179 (1963)).)

In his conclusion, Plaintiff asserts that "[a]ny alleged failure to exhaust the remedies established by the CBA with respect to his claim based on the overtime board is due to the acts and omission of the [D]efendants." (Doc. 43 at 5.)

### ii.  Plaintiff's Opposition to GP's Motion to Dismiss

As he did in response to the Union's arguments, Plaintiff asserts that GP is "re-hash[ing]" their own prior positions and claims that GP "cites to no authority for its propounding that '... plaintiff failed to allege any protected class under federal or state law.'" (Doc. 43 at 1). Plaintiff claims that "this Honorable Court '. . . must assume that [he] is neither shrewd nor experienced in dealing with . . .' the NLRB." (*Id.* (quoting *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009)).)

Plaintiff appears to assert that he was improperly treated by GP when they violated a contract, though Plaintiff is non-specific as to this alleged contractual violation in the Opposition. Plaintiff claims that he is seeking to vindicate a uniquely personal right of his employment, such as wages hours and overtime pay. (*Id.* at 2 (citing *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563, 96 S. Ct. 1048, 47 L. Ed. 2d 231 (1976)).) Plaintiff then quotes his first pleading and the Complaint in which he alleges that he was denied overtime work for the Diamond Project and that when contractual violations occurred, he was lied to. (*Id.* at 3.)

Additionally, Plaintiff claims that the Union manufactured evidence. (*Id.*) Finally, Plaintiff claims that GP failed to live up to its "higher degree of responsibility upon the parties to such agreements . . ." (*Id.* at 4 (citing *Hines*).)

### d.  The Union's Reply

The Union asserts that Plaintiff's Opposition "contains little or no discernible argument, but primarily attempts to distinguish the Union's cases based on irrelevant factual distinctions, while ignoring the relevance of the cases' reasoning." (Doc. 46 at 1.) The Union claims that "[i]ronically, [Plaintiff] describes the Union's arguments as a 're-hash,' when he is re-hasing arguments already rejected by this Court." (*Id.*)

The Union next claims that Plaintiff has failed to amend his Complaint to allege that he attempted to exhaust the grievance procedure with respect to the overtime board. (*Id.*) The Union argues that Plaintiff "points to earlier attempts at filing grievances over unrelated incidents . . . [which are] insufficient to salvage an inadequate claim." (*Id.* at 2.)

The Union asserts that this Court already dismissed Plaintiff's grievance claim related to his filing a grievance when he was "drafted under a mixture of two contracts." (*Id.* (citing Doc. 44 at 1).) It was dismissed because it was barred by the six-month statute of limitations. Additionally, the Union asserts that Plaintiff's attempt to file a grievance in or around June 2013, which occurred more than six months prior to Plaintiff's filing of this suit on June 3, 2014, is also time barred. (*Id.*)

Afterward, the Union argues that Plaintiff does not explain what a "de facto" union security agreement is, nor does Plaintiff cite any case law that supports such a claim. (*Id.* at 2–3.) The Union claims that Plaintiff "points to no agreement, written or de facto, that requires membership in the Union as a condition of employment." (*Id.* at 3.) It points out that "Plaintiff alleged that he withdrew from the Union on January 4, 2013[,] and continued working for GP until his voluntary retirement on September 15, 2014." (*Id.*) This fact prompts one conclusion: because Plaintiff was not terminated from his employment when he withdrew from the Union, "he cannot prove any set

of facts that would constitute a non-preempted claim under Louisiana's right to work statute." (*Id.*)[13]

### e.  GP's Reply

With respect to Plaintiff's harassment claim, GP asserts that "Plaintiff makes no attempt … to identify a protected class outside activities that are encompassed by the NLRA." (Doc. 45 at 2.) GP claims that "Plaintiff's new factual allegations offered to support the harassment claim deal with issues concerning Plaintiff's withdrawal from the Union, complaints about Union dues, and failure to support the Union, which are preempted by federal law and fall within the exclusive jurisdiction of the NLRB." (*Id.* (citing *Garmon*, 259 U.S. at 244–45).)

Finally, GP argues, at some length, that Plaintiff failed to allege that he exhausted the grievance procedure provided in the CBA. (*Id.* at 3–6.) Pertinently, GP argues that, to the extent Plaintiff suggested that the alleged denial of his untimely grievances excuses his failure to exhaust, "an employee may not merely assert his belief that use of grievance procedures would have been futile." (*Id.* at 4 (citing *Parham v. Carrier Corp.*, 9 F.3d 383, 390–91 (5th Cir. 1993)).)

## V.    Motion to Dismiss Standard

Rule 12(b) governs dismissal of a complaint in federal court, enumerating six separate grounds. FED. R. CIV. P. 12(b). Rule 12(b)(1) specifically allows for dismissal for "lack of subject-matter jurisdiction," FED. R. CIV. P. 12(b)(1); *Russell v. Choicepoint Servs., Inc.*, 302 F. Supp. 2d 654, 658 (E.D. La. 2004) (citing Rule 12(b)(1)). However, "[l]ike other challenges to a court's

---

[13] The Court notes that the Union has asked for the Court to deny a request made by Plaintiff in his Affidavit to depose two people. However, as the Court has excluded Plaintiff's Affidavit, the Court need not address this issue.

subject matter jurisdiction, motions raising the ripeness issue are treated as brought under Rule 12(b)(1) even if improperly identified by the moving party as brought under Rule 12(b)(6)." *St. Clair v. Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also, e.g.*, *Willoughby v. U.S. ex rel. U.S. Dep't of Army*, 730 F.3d 476, 479 (5th Cir. 2013) ("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits." (citing *Ramming v. United States*, 128 F.3d 158, 161 (5th Cir. 2001))). While the Defendants contend that Plaintiff's case should be dismissed pursuant to Rule 12(b)(6), GP separately argues with respect to Plaintiff's harassment claim, that Plaintiff's claim "remains subject to *Garmon* preemption and falls within the exclusive jurisdiction of the NLRB." (Doc. 41-1 at 9.) The Union does argue for dismissal under Rule 12(b)(6) with respect to the allegedly preempted claims, but it also asserts that "[u]nder *Garmon*, claims based on activity arguably protected or prohibited by the National Labor Relations Act . . . are subject to the primary jurisdiction of the National Labor Relations Board." (Doc. 40-1 at 3.)  Thus, while the Defendants appear to disagree on the effect of preemption, because preempted claims are subject to the jurisdiction of the NLRB, the Court will analyze arguments with respect to Plaintiff's harassment claims under Rule 12(b)(1) rather than Rule 12(b)(6). *See, e.g.*, *Lewis v. Whirlpool Corp.*, 630 F.3d 484, 487–88 (6th Cir. 2011) (considering the defense of *Garmon* preemption under Rule 12(b)(1)); *Lupiani v. Wal-Mart Stores, Inc.*, 435 F.3d 842, 845–46 (8th Cir. 2006) (same).

### a.  Rule 12(b)(6)

In *Thompson v. City of Waco, Texas*, 764 F.3d 500 (5th Cir. 2014), the Fifth Circuit summarized the Rule 12(b)(6) standard thusly:

> [The court] accept[s] all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff. [The court] need not, however, accept the plaintiff's

> legal conclusions as true. To survive dismissal, a plaintiff must plead enough facts
> to state a claim to relief that is plausible on its face. A claim has facial plausibility
> when the plaintiff pleads factual content that allows the court to draw the reasonable
> inference that the defendant is liable for the misconduct alleged.

*Id.* at 502–503 (internal citations and quotations omitted). This Court's duty is "to determine whether the [P]laintiff stated a legally cognizable claim that is plausible, not to evaluate the [P]laintiff's likelihood of success." *Id.* at 503. In effect, therefore, Plaintiff must set forth sufficient factual allegations to support a viable claim under existing law. *Iqbal*, 129 S. Ct. at 1949–50 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 550, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2006)); *see also Frith v. Guardian Life Ins. Co. of Am.*, 9 F. Supp. 2d 734, 737–38 (S.D. Tex. 1998).


### b.   Rule 12(b)(1)

Federal courts are courts of limited jurisdiction; without jurisdiction conferred by statute or the Constitution, they lack the power to adjudicate claims. *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d 281, 286–87 (5th Cir. 2012) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377, 114 S. Ct. 1673, 128 L. Ed. 2d 391 (1994), and *Stockman v. FEC*, 138 F.3d 144, 151 (5th Cir. 1998)); *accord, e.g.*, *Hall v. Louisiana*, 12 F. Supp. 3d 878, 884 (M.D. La. 2014). Under Rule 12(b)(1), a claim is "properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate" the claim. *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 668 F.3d at 286 (quoting *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998). A court should consider a Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. *Id.* (citing *Ramming*, 281 F.3d at 161, *cert. denied*, 536 U.S. 960, 122 S. Ct. 2665, 153 L. Ed. 2d 839 (2002)). Considering a Rule 12(b)(1) motion to dismiss first "prevents a court without jurisdiction from prematurely dismissing a case with prejudice." *Id.* (citing *Ramming*, 281 F.3d at 161).

"A motion to dismiss under Rule 12(b)(1) is analyzed under the same standard as a motion to dismiss under Rule 12(b)(6)." *Hall v. Louisiana*, 974 F. Supp. 2d 978, 985 (M.D. La. 2013) (citing *Benton v. United States*, 960 F.2d 19, 21 (5th Cir. 1992)). However, the Fifth Circuit has carefully explained an important distinction between the two motions:

> The choice of rules does hold the potential, however, to affect the materials in the record that may be considered when conducting our review. The Rule 12(b)(6) analysis is generally confined to a review of the complaint and its proper attachments, . . . , while under Rule 12(b)(1), the court may consider any of the following: (1) the complaint alone; (2) the complaint supplemented by the undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.

*Walch v. Adjutant General's Dep't of Tex.*, 533 F.3d 289, 293 (5th Cir. 2008) (citations and internal quotation marks omitted); *see also, e.g.*, *Breadmore v. Jacobson*, No. 4:13-CV-361, 2014 U.S. Dist. LEXIS 97332, at *6–7, 2014 WL 3543726, at *3 (S.D. Tex. July 14, 2014) (citing *id.*). Furthermore, "[t]he burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction. Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Hall*, 974 F. Supp. 2d at 986 (citations and internal quotations omitted) (citing *Celestine v. TransWood, Inc.*, 467 F. App'x 317, 318 (5th Cir. 2012)).

## VI. Discussion

### a. Plaintiff's Harassment Claims

As explained above, Plaintiff was given leave to amend his original complaint to allege a claim for harassment under federal or state law that is unrelated to Plaintiff's filing charges with the NLRB. GP argues that Plaintiff has failed to do so for one reason. The allegations in his Amended Complaint are "subject to *Garmon* preemption, and thus fall within "the exclusive jurisdiction of the NLRB," because "all . . . deal with issues concerning [P]laintiff's withdrawal

from the Union, complaints about Union dues, and failure to support the Union." (Doc. 41-1 at 8-9.) GP also argues that the email from Tim Ellsworth referenced in Plaintiff's complaint "makes no mention or suggestion of any harassment[.]" (*Id.* at 9 n. 5). Seemingly, Plaintiff counters this contention by attacking GP for "cit[ing] to no authority for its propounding that . . . plaintiff failed to allege any protected class under federal or state law." (Doc. 43 at 1 (internal quotation marks omitted).) Plaintiff also claims that he is seeking to vindicate a uniquely personal right of his employment, such as wages hours and overtime pay, immune from preemption under the NLRA. (*Id.* at 2 (citing *Hines*, 424 U.S. at 563)).) Despite these allusion, Plaintiff does not appear to directly counter GP's argument that his new harassment claims fall under the exclusive jurisdiction of the NLRB.[14]

### i.  GP's Alleged Admission that Plaintiff was being Harassed

First, with respect to Plaintiff's allegation that GP was aware of the alleged harassment, the Court agrees with GP. Quite simply, the email from Ellsworth lacks any reference to any harassment or acknowledgement that Plaintiff was being harassed. While Plaintiff alleges that Ellsworth's email "admits that he was aware that [P]laintiff was being harassed," (Doc. 35 ¶ 31 at 3), it contains no such explicit admission. Rather, Ellsworth congratulated Plaintiff on his retirement and stated he looked forward to retirement himself, statements hinting at no harassment and accepting no responsibility for such actions, if any. (Doc. 41-3 at 1.)

The only statement that Plaintiff appears to rely on from the email is, in truth, no such sturdy buttress. True, in this email, Ellsworth declared that he respected what Plaintiff and another

---

[14] Indeed, it is difficult to pin point Plaintiff's exact arguments against either of the Motions to Dismiss because of his inartful briefing.

employee did for GP, and that he was "understanding of the bullets you guys took to move our product system towards a vision that quite frankly the mill was not ready for." (*Id.*) Even viewing all facts in light most favorable to Plaintiff, as the Court is required to do on a motion to dismiss, this statement falls well short of an admission that Plaintiff was being harassed. Ellsworth makes no reference to exactly what "bullets" Plaintiff took for the company. Further, Ellsworth specifically referenced an apparent change in a "product system" that the "mill was not ready for." (*Id.*) In other words, the bullets referenced not an awareness of any other person's harassment of Plaintiff but of the extra efforts that the Plaintiff and others to prepare the mill for some new, unnamed and unspecified, enterprise.

To summarize, when read in context and with its words accorded their patent meaning, Ellsworth's email congratulates Plaintiff's retirement and vaguely references unspecified "bullets" Plaintiff took for the company. Indeed, a part of the email correspondence is Plaintiff's own original e-mail in which he wrote that he "couldn't begin to thank everyone for the time [they] spent together, but know that [he] will remember [them]." (*Id.* at 2.) Plaintiff himself makes no reference to any harassment in the very email that prompted Ellsworth's response. In its construction of this email exchange, GP is correct, and the email cannot be construed as embedded with an admission on the part of Ellsworth that Plaintiff had once been harassed.[15] An implausible extrapolation, not a reasonable construal, forms the heart of Plaintiff's case as to this issue, and such conjecturing cannot withstand Rule 12's scrutiny.

---

[15] Not only does Ellsworth's email contain no admission of the alleged harassment, the email contains no evidence of harassment towards Plaintiff.

### ii.   Whether the NLRA Controls Plaintiff's Harassment Claims

Here, Plaintiff has broadly asserted in his Amended Complaint that the harassment he allegedly suffered "was not in response to the NLRB charges" and that "the NLRB charges at most exacerbated the situation." (Doc. 35 ¶ 30 at 2.) Plaintiff claims that he was harassed based on his "refusal to allow the [U]nion and company to sweep aside a ratified agreement that he was working under[.]" (*Id.*) Additionally, Plaintiff claims he was harassed because he withdrew from the Union.[16] (*Id.*) Conversely, GP reasons that Plaintiff's allegations concern conduct covered by Section 7 and 8 of the NLRA. (Doc. 41-1 at 8-9.)

"As a general rule, federal courts do not have jurisdiction over activity which is arguably subject to Section 7 or 8 of the [NLRA], and they must defer to the exclusive competence of the National Labor Relations Board." *U.A. 198 Health & Welfare, Educ. & Pension Funds v. Rester Refrigeration Serv., Inc.*, 790 F.2d 423, 425 (5th Cir. 1986) (internal citations and quotations omitted). "The rationale for deference of state and federal courts to the competence of the [National Labor Relations] Board is to avert interference with national labor policies." *McDonald v. Oliver*, 525 F.2d 1217, 1230 (5th Cir. 1976) (citations omitted). From this policy, two different types of preemption have sprung even though the NRLA actually has no express preemption provision. *Chamber of Commerce of U.S. v. Brown*, 554 U.S. 60, 65, 128 S. Ct. 2408, 2412, 171 L. Ed. 2d 264 (2008). While the second is irrelevant here, *Garmon* preemption "is intended to preclude state interference with the National Labor Relations Board's interpretation and active enforcement of the integrated scheme of regulation established by the NLRA." *Id.* As construed, it did not, however, "displace those areas where the States traditionally have had great latitude under their

---

[16] The Court need not address Plaintiff's allegation that he requested the NLRB to investigate whether he ever joined the Union because the Union withdrew six months' worth of union dues from his paycheck. Plaintiff admits in his Amended Complaint that this grievance was resolved by the NLRB when the Union was directed to return six months' worth of dues. (Doc. 35 at 2 ¶ 30.)

police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 951 (D.C. Cir. 2014) (internal quotations and citations omitted).

As precedent establishes, the breadth of two section of the NLRA factor in this analysis. Section 7 provides:

> Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.

29 U.S.C. § 157; *BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 536, 122 S. Ct. 2390, 2402, 153 L. Ed. 2d 499 (1992) (quoting Section 7). Section 8 prohibits employers from engaging in unfair labor practices. 29 U.S.C. § 158(a)–(b); *Retail Prop. Trust*, 768 F.3d at 950.  In an example pertinent to this case, Section 8 deems it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [S]ection 7." 29 U.S.C. § 158(a)(1); *Int'l Longshoremen's Ass'n v. Davis*, 476 U.S. 380, 384 n.3, 106 S. Ct. 1904, 1908 n.3, 90 L. Ed. 2d 389 (1986) (citing *id.*). It is also an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3).

As to labor organizations, it is an unfair labor practice under Section 8 of the NLRA for "a labor organization or its agents to restrain or coerce . . . employees in the exercise of the rights guaranteed in" Section 7 of the NLRA. 29 U.S.C. §158(b)(1). Further, it is an unfair labor practice for a labor organization

> to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a)(3) … or to discriminate against an employee with respect

to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

29 U.S.C. §158(b)(2).

Here, the Court agrees with GP that Plaintiff's allegations arguably are subject to Section 7 or 8, thereby leaving this Court without subject-matter jurisdiction, for two separate reasons.

First, Plaintiff alleges that the Defendants swept aside the ratified agreement under which the Plaintiff was working. It appears that Plaintiff's complaint concerns the Defendants' "return to the CBA" in or around December 2012. (Doc. 2 ¶ 7 at 5.) This Court has already explained that this allegation is time-barred. (*See* Doc. 32 at 9; Doc. 34 at 9.) It therefore need not re-address this issue despite Plaintiff's effective reincorporation.

Second, Plaintiff alleges that he withdrew from the Union for lack of representation. (Doc. 35 ¶ 30 at 2.) Even if this allegation did not arise out of Plaintiff's filing of NLRB charges, as Plaintiff asserts in his Amended Complaint, Plaintiff's fatal problem remains. To wit, his withdrawal arguably contemplates activity under Section 7 and 8 of the NLRA because such an action concerns Plaintiff's refusal to participate in the Union.[17]

---

[17] The Court notes that Plaintiff does assert in his Amended Complaint that he suffered "physical violence" after returning to the day crew and "filed formal charges with the company for workplace violence, fearing for his safety in a hostile Union environment." (Doc. 35 at 3 ¶ 30.) While this statement alone appears conclusory, Plaintiff's original Complaint sheds light on this allegation. In his original Complaint Plaintiff alleges that when he was relieving another shift, a mechanic "began to curse [at] [him] vituperatively, and to physically intimidate [him] with his size [by] leaning forward into [his] face with opening threatening gestures." (Doc. 2 at 9 ¶ 22.) While the Court did not directly address this particular claim in its previous orders, this allegation, based on Plaintiffs pleadings, relates to Plaintiff's filing of NLRB charges. In Plaintiff's original Complaint he alleged that "[s]ince August of 2013, when he filed NLRB charges, [he] has been a target of continuous harassment by Union members through the facility." (*Id.* at 7 ¶ 15.) The alleged altercation with the mechanic took place on February 2014. (*Id.* at 9 ¶ 22.) As noted above, Plaintiff broadly asserts in his Amended Complaint that the harassment he suffered was not related to his filing NLRB charges. (Doc. 35 at 2 ¶ 30.) However, Plaintiff offers no facts to support this conclusory, and contradictory, statement in his Amended Complaint. As Plaintiff alleged that the harassment was continuous since August of 2013, when he filed NRLB charges, this alleged "physical violence" stems from Plaintiff's filing charges with the NLRB. As the Court explained in its previous rulings, it lacks jurisdiction over harassment claims stemming from Plaintiff filing NLRB charges.

Thus, as Plaintiff's additional harassment claims are arguably subject to Section 7 or 8 of the NLRA, this Court lacks jurisdiction over these claims. As such, Plaintiff's claims must be dismissed.

### b. Exhaustion of the Grievance Procedure in the Collective Bargaining Agreement

Here, Plaintiff contends that he has fully "amended his [c]omplaint to cure [the] defect ... that [he] has failed to allege that he at least attempted to exhaust the grievance procedure in the collective bargaining agreement[.]" (Doc. 35 at 1 ¶ 29.) However, as both Defendants correctly argue, Plaintiff makes no such allegation. Plaintiff alleges in his Amended Complaint that a different procedure was used to average his time into the overtime board. (*Id.*) Plaintiff asserts that this was "evidence of … *harassment*" (*Id.* at 1-2 ¶ 29 emphasis added.) and does not discuss any grievance procedures beyond his conclusory statement that he cured this defect.

Plaintiff does assert in one of his Oppositions that "[a]ny alleged failure to exhaust the remedies established by the CBA with respect to his claim based on the overtime board is due to the acts and omission of the [D]efendants." (Doc. 43 at 5.) Even so, Plaintiff has failed to allege in his Amended Complaint any facts that would support such an argument. Plaintiff specifically alleged that he was harassed, not that the Defendants acted in any way that prevented him from attempting to exhaust the grievance procedures in the collective bargaining agreement.

In the end, though given a second opportunity to do so, Plaintiff has failed to amend his complaint to allege that he at least attempted to exhaust the grievance procedure in the collective bargaining agreement. Because of this failure to meet a statutory prerequisite, Plaintiff's claim cannot survive as a matter of law. Accordingly, Plaintiff's claim with respect to the overtime board is dismissed with prejudice.

### c.   Whether Plaintiff's State Law Claims are Preempted

Apart from the foregoing allegations, Plaintiff claims that "[t]he totality of the facts and circumstances in this case constitute a violation of Louisiana's Right to Work law." (Doc. 35 ¶ 32 at 3.)

In response, both Defendants argue that such a claim is preempted by § 7 and 8 of the NLRA. *See supra* Part IV.  The Union argues that Section 14(b) of the Taft-Harley Act, encoded in 29 U.S.C. § 164(b), "allows states to prohibit union security clauses." (Doc. 40-1 at 5-6.) In this case, however, "[n]o security clause is involved." (*Id.* at 6.) As a result, Plaintiff's claim under the LRWL is preempted—or so the Union asserts. GP goes slightly further, contending that Plaintiff has "fail[ed] to allege the existence of a union security agreement[.]" (Doc. 41-1 at 12.)

Plaintiff disagrees and insists that "[g]iven the totality of facts and circumstances, de facto there is a union security agreement involved[.]" (Doc. 44 at 6). Not perfectly phrased, Plaintiff's argument is essentially that his state law claims are not preempted because states are allowed to regulate union security agreements. To the extent such an exception exists, the Union argues that no union security agreement is implicated here, for Plaintiff withdrew from the Union on January 4, 2013, and continued to work for GP until his voluntary retirement on September 15, 2014. (Doc. 46 at 3.)

Here, the Court agrees with Defendants. Section 14(b) of the Taft-Harley Act provides that:

Nothing in [the National Labor Relations Act] shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.

29 U.S.C. § 164(b). The Eastern District of Michigan has explained this statute's effect in the clearest terms:

26 of 30

> Section 14(b) limits the preemptive effect of federal law by preserving state power over certain union-security arrangements. . . . But its potency is limited. Designed primarily to limit the implications flowing from Section 8(a)(3), which expressly permits union shop and agency shop arrangements, Section 14(b) permits states to regulate only the execution and enforcement of union-security agreements. . . . States may not, for instance, regulate pre-hiring conduct subject to federal regulation even if aimed at establishing a union-security arrangement prohibited by state law. . . . And states may not regulate post-hiring conduct unrelated to the validity of a union-security agreement.

*Michigan State AFL-CIO v. Callaghan*, 15 F. Supp. 3d 712, 717–18 (E.D. Mich. 2014) (citations and internal quotation marks omitted). Like other states, *see* Matthew Dimick, *Labor Law, New Governance, and the Ghent System*, 90 N.C. L. REV. 319, 353 (2012) (tracing the history and effect of the Taft-Hartley Act), Louisiana enshrined a certain policy in response to the Taft-Harley Act:

> It is hereby declared to be the public policy of Louisiana that all persons shall have, and shall be protected in the exercise of the right, freely and without fear of penalty or reprisal, to form, join and assist labor organizations or to refrain from any such activities.

LA. R.S. § 23:981; *Davis v. Henry*, 555 So. 2d 457, 462–63 (La. 1990) (citing *id.*). A related subsection adds:

> No person shall be required, as a condition of employment, to become or remain a member of any labor organization, or to pay any dues, fees, assessments, or other charges of any kind to a labor organization.

La. R.S. § 23:983; *Apex Personnel Consultants, Inc. v. Laborde*, 413 So. 2d 524, 525 (La. Ct. App. 1982) (citing *id.*). These laws reflect the well-established recognition that "state courts have jurisdiction to enforce state right-to-work laws, that is, laws prohibiting or regulating union security agreements." *Johnson v. Elec. Sales Serv. Co.*, 363 So. 2d 716, 718 (La. App. 4th Cir. 1978). Logically (and pivotally), a union security agreement, whether express or implicit, must be shown. *Johnson*, 363 So. 2d at 718; *see also Sweeney v. Pence*, 767 F.3d 654, 659–60 (7th Cir. 2014) (reading, based on Supreme Court precedent, "Section 14(b) as protecting states' authority to enact laws prohibiting union-security arrangements that are permissible under Section 8(a)(3)

and other provisions of the NLRA"). More specifically, for Rule 12(b)'s purposes, such a de facto entity must be plausibly alleged and be supported by factual, not conclusory, allegations.

Here, Plaintiff argues that a "de facto" union security agreement exists, but Plaintiff offers little to help explain how he was ever subject to a "de facto" union security agreement. Instead, as the Union convincingly points out, Plaintiff's own factual allegations starkly contradict any such belief. The reason is obvious, apparent from Plaintiff's papers: for more than a year after withdrawing from the Union, he was able to continue working at GP until his retirement. A handful of facts bear this out, no plausible claim reasonably derivable. Plaintiff resigned from the Union on January 4, 2013. (Doc. 2 ¶ 9 at 5.) While Plaintiff alleges that he had to "terminate his employment with Georgia Pacific in September 2014" because of an allegedly "hostile Union environment," (Doc. 35 ¶ 30 at 3), the email Plaintiff actually sent "Millwide" provides that he was able to reach his "long term goal" of retirement after nearly thirty (30) years with GP. No "de facto" union security agreement could have existed under these circumstances, as Plaintiff evidently worked from leaving the Union in January 2013 to retirement in September 2014. His absence from the Union, then, had no noticeable effect on his tenure; in forsaking one (the Union), he was not forced to leave the other (GP) as an automatic consequence. Instead, whether happily or not, he remained for more than one year and eight months as GP's employee. That gap of 619 days from his renunciation of membership in the Union and his retirement, never alleged to be involuntary in Plaintiff's various filings, from GP negates the very possibility of a de facto union security agreement.  The facts alleged, in short, show this legal claim to be implausible and thus entirely subject to dismissal under Rule 12(b).[18]

---

[18] Even if a "de facto" union security agreement existed, as Plaintiff argues, there is little case law developed regarding state law regulations against "de facto" agreements and federal preemption. *See Callaghan*, 15 F. Supp. 3d at 719 (explaining that a state law regulation "prohibiting coercion aimed at establishing a de facto union-security agreement

Thus, because Plaintiff was able to continue working after withdrawing from the Union, no union security agreement exists in this case. With this exception inapplicable, preemption must follow. Therefore, Plaintiff's claim under LRWL must be dismissed.[19]

## VII.  Whether Dismissal with Prejudice is Appropriate.

GP has argued that Plaintiff's case "should be dismissed with prejudice." (Doc. 41-1 at 13.)

The Fifth Circuit has explained that:

A dismissal under Rule 12(b)(1) is a dismissal for lack of subject-matter jurisdiction. "A dismissal with prejudice is a final judgment on the merits." *Brooks v. Raymond Dugat Co.*, 336 F.3d 360, 362 (5th Cir. 2003) (citing *Schwarz v. Folloder*, 767 F.2d 125, 130 (5th Cir. 1985*); see also Boudloche v. Conoco Oil Corp.*, 615 F.2d 687, 688 (5th Cir. 1980). Accordingly, to dismiss with prejudice under Rule 12(b)(1) is to disclaim jurisdiction and then exercise it. Our precedent does not sanction the practice… *Cf. Heaton v. Monogram Credit Card Bank of Georgia*, 231 F.3d 994, 1000 (5th Cir. 2000) ("The district court properly concluded that it did not have jurisdiction but it erred in granting summary judgment and dismissing with prejudice. Since the court lacked jurisdiction over the action, it had no power to render a judgment on the merits."); *Boudloche*, 615 F.2d at 688; *Mills v. Harmon Law Offices, P.C.*, 344 F.3d 42, 45 (1st Cir. 2003) ("[T]he point of section 1447(c) is that a federal court does not have the authority to dismiss a claim over which it never had jurisdiction in the first instance. The merits of the ... claim are therefore irrelevant to this determination." (quoting *Smith v. Wis. Dep't of Agric., Trade & Consumer Prot.*, 23 F.3d 1134, 1139 n. 10 (7th Cir. 1994) (internal quotation marks omitted) (alteration and omission in original)); *Christopher v. Stanley–Bostitch, Inc.*, 240 F.3d 95, 100 (1st Cir. 2001) ("When a federal court concludes that it lacks subject matter jurisdiction over a case, it is precluded from rendering any judgments on the merits of the case.")); *but cf. U.S. ex rel. Batiste v. SLM Corp.*, 659 F.3d 1204, 1211 (D.C. Cir. 2011) (relying on a 12(b)(6) case to find waiver).

. . . might be susceptible to a preemption challenge"). As as Plaintiff was able to continue working until he reached retirement, the Court need not address this seemingly unsettled and rarely confronted question.

[19] That Court notes that in Plaintiff's Amended Complaint, he asked for this Court "to remand the case to state court where this matter was originally filed." (Doc. 35 at 3 ¶ 33). However, Plaintiff did not separately file a motion to remand for the Court to consider. Federal Rule of Civil Procedure 7 makes clear that a pleading is not a motion. *See also Waddell, v. Holiday Isle, LLC*, CIV. A. 09-0040-WS-M, 2009 WL 2413668, at *4 n. 6 (S.D. Ala. Aug. 4, 2009) ("a pleading is not a motion or brief" (citing Fed. R. Civ. P. 7(a))). Thus, Plaintiff's request for a remand is not properly before the Court and need not be addressed.

*Cox, Cox, Filo, Camel & Wilson, L.L.C. v. Sasol N.A., Inc.*, 544 F. App'x 455, 456-57 (5th Cir. 2013) (footnotes omitted).[20]  As Fifth Circuit precedent does not sanction the practice of finding a lack of subject matter jurisdiction over a plaintiff's claim and subsequently dismissing it with prejudice, the Court declines to do so here.

## VIII.    Conclusion

Accordingly,

**IT IS ORDERED** that Defendant's Motions to Dismiss, (Docs. 40, 41), are **GRANTED**;

Defendants' Motions to Dismiss are **GRANTED** in that Plaintiff's harassment claims are dismissed. This Court lacks subject matter jurisdiction over Plaintiff's harassment claims because they are arguably subject to Section 7 or 8 of the NLRA;

Defendant's Motions to Dismiss are **GRANTED** in that Plaintiff's claim with respect to the overtime board averaging is dismissed with prejudice. Plaintiff has failed to amend his complaint to allege that he at least attempted to exhaust the grievance procedure in the collective bargaining agreement.

Defendant's Motions to Dismiss are **GRANTED** in that Plaintiff's state law claim under the LRWL is dismissed. Louisiana's Right to Work law is preempted by the NLRA because, as Plaintiff was able to work after leaving the Union, no "de facto" union security agreement exists.

Signed in Baton Rouge, Louisiana, on <u>December 21, 2015</u>.

_____

**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[20] As noted by the Fifth Circuit, "[a] district court may … specifically dismiss with prejudice to relitigating a question of federal jurisdiction—i.e., with prejudice to relitigating a non-merits issue." *Cox*, 544 Fed. Appx. at 457 n. 5.